569 F.2d 1221
 Violet MEDVECZ and Michael Medvecz, her husband, Appellants,
v.
Jae Hong CHOI, Mallinckrodt, Inc., Jaime Montanez, Altoona
Hospital (A. W. Fees, Jr., Ralph Macek), Third
Party Defendants.
 No. 77-1240.
 United States Court of Appeals, Third Circuit.
 Argued Oct. 20, 1977.
Decided Dec. 22, 1977.
 
 James D. Miller, Kenneth W. Behrend, Behrend and Aronson, Pittsburgh, Pa., for appellants.
 Thomas J. Reinstadtler, Egler & Reinstadtler, Pittsburgh, Pa., for Jae Hong Choi.
 David H. Trushel, Pittsburgh, Pa., for Jaime Montanez.
 George M. Weis, Weis & Weis, Pittsburgh, Pa., for The Altoona Hospital.
 Before ADAMS, VAN DUSEN, Circuit Judges, and STERN, District Judge.*
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal raises the question whether in a medical malpractice action it was reversible error for the district court to refuse to submit to the jury the question of an anesthesiologist's alleged abandonment of the patient during an operation, and the issue of punitive damages that might flow from such an abandonment. Because we conclude that in both respects there was reversible error, a new trial is required.
 
 I.
 
 2
 Violet Medvecz underwent elective renal arteriography at the Altoona Hospital, Altoona, Pennsylvania, on December 27, 1972. The procedure required the injection of a radiopaque dye, angio-conray, into her blood vessels for the purpose of taking x-rays of her right kidney.[1] Within forty-eight hours of the operation, the patient became completely and irreversibly paralyzed from the waist down.[2]
 
 
 3
 During December of 1974, Ms. Medvecz and her husband brought an action for malpractice against Dr. Choi, the anesthesiologist for her operation, in the Eastern District of New York, where he then resided. The New York complaint was transferred to the Western District of Pennsylvania, where the Altoona Hospital is located, and was consolidated with actions that the plaintiffs had brought against the surgeon, Dr. Jaime Montanez, and the company that had manufactured angio-conray, the substance injected into Ms. Medvecz.
 
 
 4
 After extensive discovery, Dr. Montanez in February of 1976 settled his dispute with the plaintiffs, and in early October of 1976 the drug company also settled. As a result, the plaintiffs received $160,000, and the surgeon and the drug company each received releases. However, Dr. Choi joined the surgeon, the drug company and the hospital as third-party defendants. The trial finally began in the latter part of October, 1976.
 
 
 5
 Both parties conceded that the radiopaque dye used in the operation has neurotoxic properties, and that the patient's paralysis resulted from the movement of the dye from her blood vessels, where it had been injected, into her spinal cord. Yet, the parties differed as to the precise medical cause of the transfer of dye into the spinal cord.
 
 
 6
 Plaintiffs maintained that the movement of the dye resulted because the injections were continued despite a precipitous drop in Ms. Medvecz' blood pressure. They presented evidence that a qualified anesthesiologist, who is responsible for monitoring a patient's blood pressure, should have informed the surgeon that the blood pressure had dropped dramatically during the operation, and should have been aware of the neurotoxicity of the dye used in the radiography.[3] The surgeon testified that he was never told that Ms. Medvecz' blood pressure had fallen significantly, and that he would have halted the surgical procedure had he been so informed.
 
 
 7
 The plaintiffs argued that another cause of injury to the patient was the administration of neosynephrine in order to raise her blood pressure. Since the consequence of administering neosynephrine is to constrict the blood vessels, the plaintiffs contended that its injection caused the dye in effect to be squeezed into the patient's spinal cord. They presented evidence that a qualified anesthesiologist would have known that the administration of neosynephrine in such circumstances was improper.
 
 
 8
 Dr. Choi did not dispute that the recording of the patient's blood pressure and the administration of drugs, such as neosynephrine, in response to low blood pressure were the responsibilities of the anesthesiologist. However, Dr. Choi argued that the transfer of dye to the spinal cord occurred because of the volume, pressure or frequency of the injections of the dye, which were matters within the control of the surgeon.[4]
 
 
 9
 On this appeal, the central factual issues are whether Dr. Choi was present during the entire radiography procedure and, if he left the operating room during the procedure, whether he was replaced by a competent anesthesiologist. In the course of his deposition, Dr. Choi had maintained that he had been in attendance throughout the operation and until the patient's transfer to the recovery room. Although his direct examination at trial dealt with other matters, on cross-examination he suddenly testified that he did not stay in the operating room throughout the surgical procedure. Also, on cross-examination, he stated for the first time that he had been replaced by a qualified anesthesiologist.[5] Initially his testimony regarding these points was tentative. He first asserted that "(w)e might have switched our duty to cover the patients." (emphasis added). A few moments later, however, he declared that "I am sure there was a duty switch at the time (1:30 p. m.) and a new person continued care of anesthesia." (emphasis added).[6]
 
 
 10
 On further probing, Dr. Choi stated that he could not recall who had taken over his duties as anesthesiologist. He said as to this matter:
 
 
 11
 I have no memory about that, but I am sure there was a duty switch at the time and a new person continued care of anesthesia.[7]
 
 
 12
 Moreover, Dr. Choi conceded that he could not remember where he had gone after leaving the operating room, although he testified that he could not rule out the possibility that he had gone to lunch.
 
 
 13
 Dr. Choi explained that his position regarding his involvement in the operation changed after he had examined more closely the anesthesia chart. On this chart, which is kept by the anesthesiologist himself, are recordings of Ms. Medvecz' pulse and blood pressure and of the injections administered to her. The markings made to record the patient's pulse and blood pressure after 1:30 are clearly different from those made before that time.[8] When asked to reconcile the testimony in his deposition with that on cross-examination, Dr. Choi remarked:
 
 
 14
 Well, as I observed this (anesthesia chart) more closely, I would see the two different hand marks, handwritings. Therefore, during that deposition I might have said yes, and, contrary to what I answered today, which I say there is a different handwriting on the same anesthesia sheet.[9]
 
 
 15
 Despite Dr. Choi's statement on cross-examination that he had been replaced, there is no document or any testimony in the record that corroborates this view of the facts.[10] The anesthesia chart lists Dr. Choi as the only "anesthetist" for the operation.[11] The Altoona Hospital "Operative Record," which includes a pre-operative and post-operative diagnosis as well as a statement of the findings from surgery, also names Dr. Choi as the sole anesthesiologist for the procedure. In addition, the hospital log, a record of all operations in the Altoona Hospital, lists Dr. Choi alone as the anesthesiologist for Ms. Medvecz. Dr. Choi provided no explanation for the absence from all of these records of any notation indicating that he had been replaced.
 
 
 16
 The hospital personnel who testified in depositions and at trial confirmed that a replacement for Dr. Choi would have been recorded on the anesthesia chart and the "Operative Record." Moreover, when asked to identify the participants in the operation, no hospital employee mentioned any anesthesiologist other than Dr. Choi.[12]
 
 
 17
 Plaintiffs submitted several points for charge to the jury which dealt with, among other things, Dr. Choi's alleged abandonment of Ms. Medvecz and punitive damages. The trial court denied the plaintiffs' requests for instructions on these two matters on the ground that it did not believe that there was any evidence in the record on abandonment. Specifically, in a conference with counsel, the judge said:
 
 
 18
 There is really no evidence of abandonment. There is evidence that he absented himself but in the same line of testimony there is also evidence from which it may be inferred that there was a substitution. My recollection of the testimony of Dr. Choi is that he was not present at certain parts of this procedure, and although he wasn't able to say who might have been present, I was left under the impression that he would not have absented himself had there been nobody present.
 
 
 19
 When the jury was charged, no instruction was given on the issues of abandonment or punitive damages.
 
 
 20
 In response to interrogatories presented to it by the district judge, the jury found liability for negligence on the part of Dr. Choi and Dr. Montanez, but did not find liability on the part of the drug company or the hospital. Damages of $150,000 were awarded to Ms. Medvecz and damages of $50,000 were awarded to Mr. Medvecz. When the court reduced the aggregate of these figures, $200,000, by the amount of the plaintiffs' prior settlements with the surgeon and the drug company, $160,000, the plaintiffs' total recovery from the trial was $40,000.
 
 II.
 
 21
 The principal questions confronting us are whether it was reversible error to decline to instruct the jury (1) on Dr. Choi's alleged abandonment of Ms. Medvecz; and (2) on punitive damages.[13] Since this is a diversity case, in resolving these matters, we must follow the dictates of Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny, and determine whether the substantive law of Pennsylvania requires that the district court in this situation instruct the jury on abandonment and punitive damages.[14]
 
 A.
 
 22
 Inasmuch as there has been no suggestion that the refusal to charge on abandonment would have had legal effect on the verdict in the absence of a basis for punitive damages, we turn, first, to the Pennsylvania standard governing the question when a jury may be allowed to award such damages to a tort victim.
 
 
 23
 Pennsylvania has adopted the rule on punitive damages enunciated in § 908 of the Restatement of Torts and in the comments pertaining to that section. See IV Restatement of the Law of Torts § 908 (1939); McSparran v. Pennsylvania Railroad Co., 258 F.Supp. 130, 134 (E.D.Pa.1966); Chambers v. Montgomery, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963); Focht v. Rabada, 217 Pa.Super. 35, 38, 268 A.2d 157, 159 (1970).
 
 
 24
 Section 908(1) provides: " 'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct." Comment (b) to that section states that:
 
 
 25
 Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.
 
 
 26
 The meaning of the operative phrases in the Restatement discussion of punitive damages namely, "outrageous conduct" and "acts done with a bad motive or with a reckless indifference . . ." is not self-evident. At a broad level, the most important point to underscore is that acts of negligence taken alone are not a sufficient basis for awarding punitive damages.
 
 
 27
 Discussion of punitive damages in the context of this case ultimately focuses on the meaning of "reckless indifference" to the interests of others. As our attention has been drawn to no cases by the Pennsylvania courts dealing with an award of punitive damages in the medical malpractice area, we necessarily turn to cases dealing with such damages in other situations.
 
 
 28
 The dimensions of the standard of "reckless indifference" are suggested by Focht v. Rabada, supra. In Focht, the Superior Court held that driving while under the influence of intoxicating liquor may be deemed to constitute such "reckless indifference" to the interests of others as to justify punitive damages. The Focht court quoted with approval comment (d) of § 500 of the Restatement of Torts, which states that " 'if the conduct involves a high degree of chance that serious harm will result, that fact, that (the actor) knows or has reason to know that others are within the range of its effect, is conclusive of his recklessness.' (emphasis added)"[15]
 
 
 29
 Focht stressed that a significant danger to others inevitably attends the act of driving while intoxicated. Moreover, it noted that "(e)very licensed driver is aware that driving while under the influence of intoxicating liquor presents a significant and very real danger to others in the area."[16] Thus, the court concluded that an intoxicated driver knows or has reason to know that his behavior entails a high degree of risk of serious harm and, as a result, that such a driver exhibits reckless indifference toward others.
 
 
 30
 In Focht the underlying situation was contrasted with that in Chambers v. Montgomery, supra. The defendant in Chambers struck the plaintiff twice with his fists, and the court stated that such fact alone did not constitute sufficient evidence to support a finding that the assault was "malicious, wanton, reckless or oppressive."[17] In distinguishing Chambers, the Focht court observed that striking with fists will "ordinarily not result in serious harm," and that in such a case "motive or intent" will "loom as significant considerations in passing on the question of punitive damages."[18] Where there is an instance of an intoxicated driver of a motor vehicle, Focht asserted, the issues of motive or intent are not as significant, for reckless indifference may be demonstrated.[19]
 
 
 31
 The Restatement, in discussing the standard for the award of punitive damages makes no exception for medical malpractice cases. Indeed, one court has specifically declared that "(t)here would appear to be no rational justification for any separate rule or language applicable to the medical profession." Noe v. Kaiser Foundation Hospitals, 248 Or. 420, 435 P.2d 306, 308 (1967). The question in medical malpractice cases, as in tort actions generally, is whether there has been sufficiently aggravated conduct contrary to the plaintiffs' interests, involving bad motive or reckless indifference, to justify the special sanction of punitive damages. That sanction serves the dual function of penalizing past conduct constituting an aggravated violation of another's interests, and of deterring such behavior in the future.[20]
 
 
 32
 This Court applied a standard of "reckless indifference" in the medical malpractice context in the venerable case of Mandeville v. Courtright, 142 F. 97, 101 (1905), cert. denied, 202 U.S. 615, 26 S.Ct. 764, 50 L.Ed. 1172 (1906). In Mandeville, we held that it was proper to award punitive damages to a patient whose jaw was broken when a dentist extracted a piece of jawbone upon the erroneous supposition that it was the root or a piece of tooth. The person acting as a dentist was not licensed in Pennsylvania. The Court concluded that putting a patient in the hands of someone lacking the necessary qualifications exhibited reckless disregard of the patient's interests.[21]B.
 
 
 33
 In view of the Pennsylvania standard governing the award of punitive damages, we must decide whether there is sufficient evidence in the record for a jury to determine that Dr. Choi exhibited reckless indifference to the interests of Ms. Medvecz.
 
 
 34
 The only predicate suggested for the determination that reckless indifference was manifested on the part of Dr. Choi would be a finding that he abandoned Ms. Medvecz in the course of the radiography procedure in question. Thus, first of all, we must ascertain whether a finding of abandonment would be permissible on the basis of the record in this case.[22] If such a finding would be permitted, we must determine, second, whether an abandonment by Dr. Choi could be found by the jury not that it necessarily would be found[23] to constitute reckless indifference.
 
 
 35
 Whether Dr. Choi abandoned the patient while she was on the operating table cannot be definitively resolved by an appellate court on the basis of the evidence adduced at the trial. On the one hand, Dr. Choi admitted to having left the operating room at 1:30 p. m., and stated that he may then have gone to lunch. There is evidence that the surgeon depended on the anesthesiologist to monitor the patient's pulse and blood pressure, and to keep him posted regarding this vital information as he proceeded with the operation. However, the surgeon was not told about the drop in Ms. Medvecz' blood pressure. Also, none of the other attending personnel recalled that anyone took Dr. Choi's place, and Dr. Choi himself could not specify the name or other identity of the person who allegedly replaced him. Further, there is no testimony regarding any communication between the surgeon and any anesthesiologist after 1:30 p. m.
 
 
 36
 On the other hand, Dr. Choi insisted that he would not have left the operating room unless he had been replaced by a competent anesthesiologist. Also, the anesthesia chart, upon visual inspection, seems to reflect two different handwritings, giving rise to a possible inference that Dr. Choi had been "replaced" in the sense that someone else albeit, one who was never identified proceeded to record Ms. Medvecz' blood pressure and pulse after he departed. Once Dr. Choi testified that he had left the operating room in the midst of a delicate procedure, the only evidence that this step would not constitute an abandonment would be if he had been replaced by competent medical personnel. But Dr. Choi was not able to indicate who, if anyone, did replace him, or what the credentials of any replacement who performed the functions of an anesthesiologist might have been.
 
 
 37
 Although the record is not conclusive, it is not so thin that a jury should be precluded from finding abandonment.[24] The case was tried before a jury and it was for the jury to choose which of Dr. Choi's conflicting statements to believe: that he did not leave; or that he did leave but was replaced; or that he never would have left had he not been replaced. The only possible basis for not permitting the jury to determine that there had been an abandonment is the supposition that Dr. Choi's statement that he would not have left the operating room without a suitable replacement was not open to doubt. However, in light of the absence of any corroboration of Dr. Choi's assertion that he was replaced, and since a jury could find that at his pretrial deposition Dr. Choi suppressed the fact of his departure, the jury was entitled to believe that he did indeed leave the operating room. Also, given Dr. Choi's total failure to recall the identity of his replacement, a jury could reasonably disbelieve his assertion that he was replaced. The jury certainly was entitled to discredit this professed lack of memory concerning a procedure that had left his patient hopelessly paralyzed forty-eight hours later.
 
 
 38
 On the basis of the evidence, then, we conclude that the jury should have been allowed to determine whether Dr. Choi did abandon Ms. Medvecz while she was on the operating table.
 
 
 39
 If a jury were to find that Dr. Choi had abandoned Ms. Medvecz in the sense that he left the operating room while she was still on the table, and that he was not replaced at the time of departure by a competent anesthesiologist, then the jury could also find that Dr. Choi manifested reckless indifference toward Ms. Medvecz.
 
 
 40
 The discussion in Focht, supra, provides a helpful framework for our analysis of this issue. As the opinion in Focht suggests, reckless indifference may be found to occur, first, where there is great danger to others from the course of conduct in question, and, second, where the actor may be assumed to know or to have reason to know of the magnitude of the risk involved in the conduct at issue.
 
 
 41
 One major risk that arises from the abandonment of a patient by an anesthesiologist is manifest: if there is no qualified anesthesiologist in attendance during an operation, the administration of anesthesia itself may be faulty, and it thus may create a danger to the patient's health and safety.
 
 
 42
 Yet, that was not the only substantial risk arising from the operation here, in which a drug known to have neurotoxic properties was injected into the patient's blood stream. In this case, the patient's blood pressure, which was monitored by the anesthesiologist, dropped drastically during the operation. There is an indication that by 1:30 p. m., when Dr. Choi conceded that he had left the operating room, the patient's blood pressure had fallen to 70 over 0.[25] In such circumstances, given that the anesthesiologist is responsible for recording blood pressure and for administering medications in response to falling blood pressure, an abandonment by the anesthesiologist creates a serious danger that improper steps may be taken to counteract the patient's lowered blood pressure. Also, without a qualified anesthesiologist in the operating room, there would be no trained person to inform the surgeon during the radiography procedure of the radical change in the patient's condition. Thus, a jury could find, based on the evidence, that a great danger to Ms. Medvecz arose when and if Dr. Choi left the operating room.
 
 
 43
 In addition, a jury could conclude that Dr. Choi knew or had reason to know that such a substantial risk to the patient would result from his leaving the operating room. In particular, there is testimony that a qualified anesthesiologist would have known of the neurotoxic properties of the dye utilized in the operation. Dr. Choi himself was aware of the neurotoxic propensities of the dye.[26] There is also evidence that a qualified anesthesiologist would have informed the surgeon of the dramatic drop in the patient's blood pressure during the operation, for he would have known of the great risk of not doing so. And there is testimony indicating that a qualified anesthesiologist would have known that neosynephrine operated to constrict the patient's blood vessels. Considering all this evidence, it would be reasonable for a jury to conclude that, if Dr. Choi left the operating room without having a competent replacement, he did so knowing or having reason to know of the significant risk to Ms. Medvecz that was thereby created.
 
 
 44
 Consequently, in light of the Focht analysis of the "reckless indifference" standard for an award of punitive damages, there is evidence on the basis of which a jury could conclude that the anesthesiologist exhibited reckless indifference toward Ms. Medvecz.[27]
 
 C.
 
 45
 At oral argument a question was raised sua sponte by the panel about the correctness of the points for charge submitted to the district court by the plaintiffs. It was suggested that these points were not in the proper form for two reasons: first, they did not adopt the Restatement standard that governs the award of punitive damages; and second, plaintiffs stated in the requested points that the jury "shall" award punitive damages against Dr. Choi if it finds that he abandoned the patient, whereas it is proper only to instruct the jury that it "may" award such damages if it finds that an abandonment occurred.
 
 
 46
 Although there are problems with the requested points for charge, this fact should not determine our resolution of the present case. As a practical matter, the written points for charge were not the only means by which the trial court became apprised of the plaintiffs' requests for instructions on abandonment and punitive damages. As the record indicates, in colloquies with the trial judge plaintiffs' counsel pressed repeatedly for jury instructions on the two matters in question. In addition, it is clear from the record that the decision of the trial judge not to charge on abandonment and punitive damages had nothing to do with the form of the requested points for charge.
 
 
 47
 Thus, while we admonish counsel to submit properly drafted points for charge in the future, we cannot say that, on the basis of the record here, the fact that the requested instructions were in certain respects deficient is an appropriate basis on which to refuse to grant a new trial.
 
 III.
 
 48
 In sum, a review of the evidence has convinced us that it was error for the trial court not to have allowed the jury to decide whether Dr. Choi abandoned Ms. Medvecz. Further, the jury should have been permitted to determine whether Dr. Choi's conduct amounted to reckless indifference toward the patient's interests and, if it so concluded, to award punitive damages.
 
 
 49
 Accordingly, the judgment of the district court will be reversed and the case remanded for a new trial consistent with this opinion.
 
 
 
 *
 United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The aim of the procedure, which was entirely elective and could have been postponed, was to determine whether Ms. Medvecz suffered from any tumors in her right kidney. As a result of the operation, it was ascertained that she did not suffer from such a condition
 
 
 [2]
 Uncontradicted evidence indicated that Ms. Medvecz will never regain any motor capacity in her lower extremities or any control over her bowel or bladder functions
 
 
 [3]
 At oral argument, Dr. Choi's counsel stressed that the literature on the neurotoxicity of the dye is in medical journals that an anesthesiologist would not likely read. However, in his deposition, Dr. Choi said that he was aware that the dye could have neurotoxic effects. See Appendix at 332a-333a
 
 
 [4]
 Since the jury returned a verdict against Dr. Choi on the issue of negligence, as a logical matter it could not have accepted the defendant's arguments that he did not cause the injury to her
 
 
 [5]
 At oral argument, Dr. Choi's attorney conceded that he had been "chagrined" when Dr. Choi testified, for the first time on cross-examination, that he had left the operating room
 
 
 [6]
 Dr. Choi was employed by Anesthesia Associates, a professional group that functioned as an independent contractor in the hospital. Ms. Medvecz' written consent extended to "whomever Anesthesia Associates may appoint." It is not clear from the record whether or not there were anesthesiologists at the hospital not employed by Anesthesia Associates. Any "duty switch" involving Dr. Choi that was within the scope of the patient's authorization thus apparently would have been arranged by Anesthesia Associates
 
 
 [7]
 Appendix at 821a
 
 
 [8]
 As indicated by the anesthesia chart, the blood pressure was at its lowest point at 1:30 p. m., and the neosynephrine was administered after that time. The operation began at 12:25 p. m. and was concluded at 3:15 p. m., according to the anesthesia chart
 
 
 [9]
 Appendix at 832a-833a. In fact, at his deposition Dr. Choi was given the anesthesia chart or an enlarged copy of it and was questioned extensively about it. He was asked specifically whether it was his handwriting that was on the chart, and he said that it was. Moreover, at oral argument Dr. Choi's counsel remarked that "anybody who looked at the anesthesia record from day one knew there was a change in the handwriting. . . . There always was a problem."
 
 
 [10]
 After the close of evidence, counsel discussed in chambers whether the evidence indicated the possibility of an abandonment. Mr. Baginski, counsel for Dr. Montanez, the surgeon, and for Ms. Messner, the x-ray technician, said that his clients had informed him that morning that Dr. Choi had left the operating room and had been replaced by another anesthesiologist. Plaintiffs' attorney remarked that this representation by opposing counsel was contrary to the earlier testimony of Montanez and Messner, but Mr. Baginski maintained that those two witnesses had never been asked whether Dr. Choi was present throughout the operation
 In fact, at trial Ms. Messner had been questioned specifically whether Dr. Choi was present the entire time, and she said "yes." And Dr. Montanez, at his deposition, said that the anesthesiologist was there the whole time although he did not recall who the anesthesiologist was, and that any replacement would have been noted on the records of the operation. At trial he gave similar testimony and, in addition, indicated that he then recalled that Dr. Choi was the anesthesiologist for the procedure.
 
 
 [11]
 On the anesthesia chart a slash appears after Dr. Choi's name. There is nothing written after that slash. Several witnesses, including Dr. Choi, were asked to explain the meaning of the slash, and no one was able to provide any explanation
 
 
 [12]
 The witnesses to the operation were the surgeon, the surgeon's nurse, the x-ray technician, and the scrub technician who recorded the "Operative Record." A representative excerpt from the testimony at the trial of the attending personnel is the following taken from the testimony of the surgeon's nurse, who was put on the stand by Dr. Choi:
 Q. Besides you and the doctor, who was present?
 A. The anesthesiologist, the x-ray technician and one of the girls that worked for the hospital from the operating room.
 Q. In addition to Mrs. Medvecz, there were three women and two men there, the women being one nurse and one x-ray technician and the other one being from the hospital surgical department. And there was Dr. Montanez and the anesthesiologist, Dr. Choi; is that right?
 A. Right.
 Q. No one else was there?
 A. Well, I think from time to time, you know, in the x-ray department people come in and out to help you unload the films and to take them to develop. I mean there might have been people in and out of the room, but those were the people I can remember being there for the procedure.
 Appendix at 596a.
 
 
 [13]
 Although oral argument was limited at this Court's request to the issues of abandonment and punitive damages, the plaintiffs' briefs advance three additional contentions. First, the plaintiffs urge that the damages awarded by the jury were inadequate. We conclude that aside from the issues of abandonment and punitive damages, the amount of the verdict does not raise an issue that would compel reversal. Second, the plaintiffs argue that the trial court abused its discretion in denying their request for more than three peremptory jury challenges, when Dr. Choi and the three third-party defendants were each granted three such challenges. We do not find that this ruling was an abuse of discretion. Third, the plaintiffs maintain that they were entitled to a new trial because misrepresentation and fraud on the part of the witnesses to the operation prevented the plaintiffs from developing evidence for their case. Since we grant a new trial on the issues of abandonment and punitive damages, we need not rule on whether misrepresentation and fraud constitute an appropriate alternative ground for a new trial
 
 
 [14]
 It is important to note that, while a federal diversity court must not fashion a wholly independent federal standard with which to determine matters of substantive right, it likewise must not conceive its role as applying the state decisional law to the case at hand in a narrow and mechanical fashion. Rather, a federal court must scrutinize the relevant state precedents with an eye toward the broad policies and principles that underlie and are given concrete embodiment in the cases. See Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 208-211, 76 S.Ct. 273, 100 L.Ed. 199 (1955); Quinones v. United States, 492 F.2d 1269, 1276-1279 (3d Cir. 1974)
 
 
 [15]
 268 A.2d at 159
 
 
 [16]
 268 A.2d at 161
 
 
 [17]
 192 A.2d at 358
 
 
 [18]
 268 A.2d at 160
 
 
 [19]
 In Focht, the lower court ruled that punitive damages could not be awarded as a matter of law. In reversing that judgment, the Superior Court said that, upon retrial, the judge must determine as a preliminary matter whether the plaintiff's offers of proof warranted submission to the jury of the question of punitive damages. See 268 A.2d at 161
 
 
 [20]
 As it is written in comment (a) to § 908 of the Restatement of Torts : "The purposes of awarding punitive damages or 'exemplary' damages as they are frequently called, are to punish the person doing the wrongful act and to discourage such person and others from similar conduct in the future."
 
 
 [21]
 Although we have found no medical malpractice situations identical to the one before us here, there are a number of cases from other jurisdictions where the "reckless indifference" standard has been applied in the context of a medical malpractice charge. Thus, in Los Alamos Medical Center v. Coe, 58 N.M. 686, 275 P.2d 175, 178 (1954), a patient, after inquiry, was reassured by her doctor that she had no cause for alarm about becoming addicted to the morphine that he was prescribing for her; nevertheless, she did become addicted. The court concluded that the patient's inquiry put the doctor on notice of the danger, and that the physician's reassurance was sufficient evidence of his indifference as to the harmful results of his action to take the issue of punitive damages to the jury
 Similarly, the court in Rennewanz v. Dean, 114 Or. 259, 229 P. 372, 374-375 (1924), held that punitive damages were permissible when a patient suffering from a rectal hemorrhage while in a physician's office was compelled to lie on a couch in an adjacent office and to remain there continuously, unattended, for approximately 48 hours. This was said to meet the standard of malicious, wanton, or reckless indifference to the patient's interests.
 See Green v. Hale, 433 F.2d 324, 331 (5th Cir. 1970), where the court held that it was proper to submit to a jury the question of punitive damages where a physician concealed from the parents of an infant the fact that he was not authorized to admit and treat persons in a local hospital at a time that, from all appearances, was critical to the child's health, and the child died without being admitted to the hospital even though the parents repeatedly had asked that he be so admitted.
 See also Dill v. Miles, 181 Kan. 350, 310 P.2d 896, 898-899 (1957); Holland v. Eugene Hospital, 127 Or. 256, 270 P. 784, 789-790 (Pr.1928).
 
 
 [22]
 Evidence of conduct as to which punitive damages may be allowed "must appear affirmatively in the evidence. It cannot be presumed." Thompson v. Swank, 317 Pa. 158, 159, 176 A. 211 (1934)
 
 
 [23]
 In their briefs and at oral argument, both parties failed to distinguish clearly between these two points. It is this Court's position not that a jury must award punitive damages if it finds that Dr. Choi abandoned Ms. Medvecz, but that it may so act in such an event
 
 
 [24]
 See MacDonald v. Pennsylvania Railroad Co., 348 Pa. 558, 562, 36 A.2d 492, 494 (1944), where the court referred to ". . . the long prevailing rule that issues of fact where there is more than a scintilla of evidence on each side must be submitted to the jury."
 
 
 [25]
 Normal blood pressure is generally considered to be in the vicinity of 120 over 80
 
 
 [26]
 See n.3 supra
 
 
 [27]
 The conclusion in this case does not dilute the force of decisions refusing to allow punitive damages when the evidence supports only inferences about a mistake or inadvertence by a physician. For example, courts have held that punitive damages are not permissible when a surgeon, as the result of a mix-up in hospital charts, operated on the wrong patient, see Ebaugh v. Rabkin, 22 Cal.App.3d 891, 99 Cal.Rptr. 706, 708-709 (1972); and when a resident physician, who delivered a baby, circumcised the infant even though the staff doctor had been advised that the parents did not want this done, see Noe v. Kaiser Foundation Hospitals, 248 Or. 420, 435 P.2d 306, 308-309 (1967). Such situations dealt with physician error and resulting injury to a patient. Nevertheless, the courts declined to award punitive damages because in the courts' view they involved no evidence of aggravated and "outrageous" misconduct. Such cases are distinguishable from the present one, in which it seems unrealistic to say that a jury could find only that Dr. Choi's action was the result of inadvertence or mistake