**Sondra L. McKENNA and James R. McKenna, Appellants,**

v.

**ORTHO PHARMACEUTICAL CORPORATION.**

**No. 78–2567.**

United States Court of Appeals, Third Circuit.

Argued Sept. 5, 1979.

Reassigned Jan. 2, 1980.

Decided March 18, 1980.

Rehearing Denied June 17, 1980.

John E. Evans, Jr. (argued), Evans, Ivory & Evans, Pittsburgh, Pa., for appellants.

G. Daniel Carney, Thorp, Reed & Armstrong, Pittsburgh, Pa., David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City, Robert W. Sparks (argued), Johnson & Johnson, New Brunswick, N. J., for appellee.

Before ADAMS, HUNTER and HIGGIN-BOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

After trial, but prior to the presentation of the case to the jury, the district court in this diversity case granted defendants' motion for a directed verdict on the ground that Ohio law barred recovery. Because we are persuaded by a careful review of the Ohio decisional law, as well as other relevant sources, that the Supreme Court of Ohio would not construe its statute of limitations so as to preclude recovery in this case, we reverse.

### I.

James and Sondra McKenna brought this suit for negligence, misrepresentation, and products liability against Ortho Pharmaceutical Corporation (Ortho). The plaintiffs charged that Mrs. McKenna suffered severe personal injury and permanent disability as a result of ingesting Ortho-Novum, an oral contraceptive manufactured and marketed by Ortho. Following the birth of the McKennas' second child, Mrs. McKenna began using Ortho-Novum in January 1965, after receiving assurances both from Ortho's published brochure and from her personal physician, that the drug was safe and posed no serious risks. In 1967, Mrs. McKenna developed severe headaches and also experienced two attacks of transient ischemia. While hospitalized in 1969 for a stomach ailment involving vessel wall damage, Mrs. McKenna was told that she had high blood pressure, which was characterized as hypertension. In June 1969, Mrs. McKenna ceased using the oral contraceptives. Three years later, in March 1972, she suffered a catastrophic cerebrovascular stroke that left her severely and permanently paralyzed.[1]

---

1. The complaint alleged that as a direct result of her use of Ortho-Novum, Mrs. McKenna suffered the following permanent injuries: paralysis of both legs and arms; bilateral facial paralysis; double vision; impairment of

One year and nine months thereafter, in November 1973, the McKennas commenced this action in a Pennsylvania state court by a praecipe for a writ of trespass.[2] On Ortho's motion, the suit was removed to the federal district court in Pittsburgh, where it was ultimately tried. The plaintiffs claimed that Mrs. McKenna's injuries were caused by her ingestion of Ortho-Novum; that Mrs. McKenna relied on Ortho's false assurances about the product's safety in deciding to use Ortho-Novum; that Ortho knew or should have known that these statements were false; and that Ortho-Novum posed a risk of serious harm to its users.

Prior to trial, the district court denied Ortho's motion for summary judgment on the ground that a genuine issue of material fact existed as to whether the McKennas knew, or reasonably should have known, more than two years prior to the commencement of the suit, that Mrs. McKenna's injuries resulted from the ingestion of Ortho-Novum. During the four weeks of jury trial, the McKennas introduced expert witnesses who testified that the cerebrovascular stroke was the ultimate result of either vessel-wall damage or high blood pressure, and that both of these conditions, as well as the headaches and transient ischemia attacks, were caused by Mrs. McKenna's ingestion of Ortho-Novum. At the

close of trial, but prior to submission of the case to the jury, the district court granted Ortho's motion for a directed verdict on the ground that the action was barred under Ohio's statute of limitations. The district court concluded that the Ohio statute began to run, at the latest, in 1969 when Mrs. McKenna developed high blood pressure, and that the cause of action was accordingly barred because it was filed more than two years after that time. It is this conclusion that we review here.

## II.

Although Pennsylvania courts ordinarily apply the statute of limitations of the forum state,[3] the Pennsylvania "borrowing statute" in effect when the case was tried provided a statutory exception to this rule. It declared:

> When a cause of action has been fully barred by the law of the state in which it arose, such bar shall be a complete defense to an action thereon in any of the courts of this Commonwealth.[4]

The district court, in granting Ortho's motion for a directed verdict, reasoned that the Pennsylvania statute borrowed not only Ohio's two-year limitations period, but also Ohio's law governing the determination when the cause of action arises. In their appeal, the McKennas contend that this was

---

speech; impairment of hearing; internal injuries; shock and injury to her nervous system.

**2.** The district court noted that inasmuch as the plaintiffs' counsel is a Pittsburgh attorney, "it was natural" that suit was brought in Pennsylvania.

**3.** Under the doctrine of *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court exercising diversity jurisdiction must apply state rather than federal decisional law to questions of a "substantive" character. In order to determine which state's law applies, a federal court must ascertain the substantive law that would be applied to the question by a court of the state in which it is located, *Klaxon Co. v. Stanton Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1943), in this case Pennsylvania. Inasmuch as all of the significant events pertinent to this action occurred in Ohio, it is not disputed that the cause of action arose in Ohio and that under Pennsylvania's conflict of law rules, *see Griffith v. United Air*

*Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), the substantive law of Ohio governs this action.

**4.** Pa.Stat.Ann. tit. 12, § 39 (repealed 1978).

This provision was replaced by a similar provision which provides that:

(b) General rule—The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim. 42 Pa.Const.Stat.Ann. § 5521 (eff. June 27, 1978).

Section 39 remains determinative in this action, because of a savings clause which provides:

No cause of action fully barred prior to the effective date of this Act shall be revised by reason of the enactment of this Act.

Act of July 9, 1976, P.L. 586, No. 142, § 25(b), *reprinted in* 42 Pa.Cons.Stat.Ann. § 5521 note.

error; they argue that even though the Pennsylvania statute "borrows" the law of Ohio regarding the length of the applicable limitations period, the question when that limitations period begins to run must be determined not by Ohio but by Pennsylvania law.

The McKennas premise their argument on this Court's prior decision in *Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Company.*[5] In *Mack Trucks*, we were asked to decide when an action for indemnity arose, for the purpose of determining whether the Pennsylvania "borrowing statute" was applicable to that action. Noting the "familiar rule" that a statute of limitations "begins to run when the cause of action arises, as determined by the occurrence of the final significant event necessary to make the claim suable," we held that a "cause arises *where* as well as *when* the final significant event that is essential to a suable claim occurs."[6] Because the final significant event essential to the action for indemnity happened in Florida, we concluded that Florida's statute of limitations applied.

*Mack Trucks'* application of the Pennsylvania "borrowing statute," the McKennas claim, depended upon the ascertainment of where the cause of action arose, which in turn was based on the prior determination of when it accrued. In support of this interpretation, the McKennas rely on *Prince v. Trustees of the University of Pennsylvania,*[7] which held, on the basis of *Mack Trucks*, that the "borrowing statute" applies "only upon satisfaction of two contingencies: (1) the cause of action must arise in another state; and (2) the cause of action must be totally barred by the law of that state. Under the *Mack Truck* analysis," the district court concluded, "satisfaction of the first contingency is determined by finding where the cause of action arose, and the

determination is to be governed by Pennsylvania law."[8]

The crux of the justification offered for this construction of *Mack Trucks* is the assertion that we determined when the cause of action arose in that case by references to Pennsylvania law. But, as the most recent decision addressing this issue points out, "*Mack Trucks* relied not only on Pennsylvania cases but also on cases from other jurisdictions."[9] Nor was there any suggestion in *Mack Trucks* that Florida would have commenced the running of the statute of limitations at a time different from when Pennsylvania would have. Inasmuch as *Mack Trucks* did not even discuss this issue, we do not find that decision controlling here.

■ We are persuaded, rather, that the apparent purpose of the Pennsylvania "borrowing statute" requires us to look to the law of the state where the cause of action arose to determine not only the prescribed period of limitations but also the point at which the statute begins to run. By its terms, the "borrowing statute" bars a plaintiff from suing in Pennsylvania "when [the] cause of action has been fully barred by the laws of the state . . . in which it arose . . . ." In our view, the essential question posed under the "borrowing statute" is whether the action in question is precluded by the laws of the state in which it accrued, and the answer to that question also must be based on the law of the state in which the claim arose. To do otherwise might well revive an action which is "fully barred by the laws" of another state. Accordingly, because the McKennas' cause of action arose in Ohio, we must look to Ohio law to determine when Ohio's statute of limitations commenced to run. And the question for decision, then, is whether Ohio's statute of limitations commenced to run prior to the date Mrs. McKenna knew,

5. 372 F.2d. 18 (3d Cir. 1966).

6. 372 F.2d at 20.

7. 282 F.Supp. 832 (E.D.Pa.1968).

8. 282 F.Supp. at 840.

9. *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 453 F.Supp. 527, 532 (W.D.Pa. 1978).

or reasonably should have discovered, that her injuries were caused by Ortho-Novum.[10]

### III.

Given that Ohio law governs the question for decision, the task remains to determine what the pertinent Ohio law is and then to apply it to this controversy. The question of how a federal court is to ascertain and apply state decisional law to a particular case has provoked considerable comment from courts and commentators alike.[11] As some have noted, the concept that a federal court must determine state law is somewhat misleading inasmuch as it implies the existence of a readily accessible and easily understood body of state law.[12] On the contrary, the law of a state is frequently "dynamic rather than static," [13] and consists of a working body of rules, which find expression in a number of sources. It is this working body of rules to which a federal court must look in order to ascertain the state law that governs in a particular case.

In those few instances in which the highest state court has recently spoken to the precise question at issue in a particular setting, the duty of the federal court to determine and apply state law is easily met. After all, "[t]he State's highest court is the best authority on its own law." [14] The problem of ascertainment arises when, as here, the highest state court has not yet authoritatively addressed the critical issue. Recent opinions of this Court make clear that our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem.[15] Although some

10. The Ohio statute of limitations applicable to Sondra McKenna's claim is Ohio Rev.Code Ann. § 2305.10 (Page 1954), which provides:

An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose.

The pertinent statute for James McKenna's derivative claim is Ohio Rev.Code Ann. § 2305.09 (Page 1954), which provides in part:

An action for any of the following causes shall be brought within four years after the cause thereof accrued:

(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in [other] sections . . . of the Revised Code.

11. *See, e. g., Commissioner v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1955); *Becker v. Interstate Properties,* 569 F.2d 1203 (3rd Cir. 1977); C. Wright, *Law of Federal Courts,* § 158, at 267–71 (3d ed. 1976); 1A *Moore's Federal Practice,* para. 0.309, 3323–3330 (2d ed.) and *id.* 73–74 (1978–79 Supp.); Kurland, *Mr. Justice Frankfurter, The Supreme Court and the Erie Doctrine in Diversity Cases,* 67 Yale L.J. 187 (1957); Note, *Federal Interpretation of State Law—An Argument for Expanded Scope of Inquiry,* 53 Minn.L.Rev. 806 (1969).

12. *See, e. g.,* Note, *Federal Interpretation of State Law—An Argument for Expanded Scope of Inquiry,* 53 Minn.L.Rev. 806, 811 (1969).

13. *Id.*

14. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1965). "If there be no decision by that Court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the state." *Id.* The *Erie* Court expressly intended that federal courts were to be governed by the law of each state whether it "be declared by its legislature or by its highest court in a decision." 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

15. *E. g., Becker v. Interstate Properties,* 569 F.2d 1203, 1205 (3d Cir. 1977) ("Inasmuch as no New Jersey cases are squarely on point, it is important to make clear that our disposition of this case must be governed by a prediction of what a New Jersey court would do if confronted with the facts before us."); *Huddell v. Levin,* 537 F.2d 726, 733 (3d Cir. 1976) ("This appeal requires us to predict how the New Jersey Supreme Court would react when presented with novel and difficult questions of tort law."); *Wise v. George C. Rothwell, Inc.,* 496 F.2d 384, 387 (3d Cir. 1974) ("We are bound to apply the standard of care the Delaware Supreme Court would apply were it faced with the issue now before us."). Our position is in accord with the rule accepted by a majority of the other Circuits. *E. g., Soo Line R. Co. v. Fruehauf Corp.,* 547 F.2d 1365 (8th Cir. 1977); *Gates Rubber Company v. USM Corp.,* 508 F.2d 603 (7th Cir. 1975); *Warren Bros. Co. v. Cardi Corp.,* 471 F.2d 1304 (1st Cir. 1973).

It is regrettable that Ohio has not yet established a certification procedure that would enable this Court to obtain a definitive answer to the crucial question in this case from the Ohio Supreme Court. The United States Supreme Court has expressed its approval of such a procedure. *Lehman Bros. v. Schein,* 416 U.S.

have characterized this assignment as speculative or crystal-ball gazing, nonetheless it is a task which we may not decline.

■ An accurate forecast of Ohio's law, as it would be expressed by its highest court, requires an examination of all relevant sources of that state's law in order to isolate those factors that would inform its decision. The primary source that must be analyzed of course, is the decisional law of the Ohio Supreme Court. In the absence of authority directly on point, decisions by that court in analogous cases provide useful indications of the court's probable disposition of a particular question of law. It is important to note, however, that our prediction "cannot be the product of a mere recitation of previously decided cases."[16] In determining state law, a federal tribunal should be careful to avoid the "danger" of giving "a state court decision a more binding effect than would a court of that state under similar circumstances."[17] Rather, relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince.[18]

■ Considered dicta by the state's highest court may also provide a federal court

with reliable indicia of how the state tribunal might rule on a particular question.[19] Because the highest state court "enjoys some latitude of decision in ascertaining the law applicable to a particular dispute even where there may be dicta in point,"[20] however, a federal court should be circumspect in surrendering its own judgment concerning what the state law is on account of dicta. As Professor Charles Alan Wright has written, "much depends on the character of the dictum."[21] Of somewhat less importance to a prognostication of what the highest state court will do are decisions of lower state courts and other federal courts. Such decisions should be accorded "proper regard" of course, but not conclusive effect.[22] Thus, the Supreme Court has held that although the decision of a lower state court "should be 'attributed some weight . . . the decision [is] not controlling . . . .' where the highest court of the State has not spoken on the point. . . . Thus, under some conditions, federal authority may not be bound even by an intermediate state appellate court ruling."[23] Additionally, federal courts may consider scholarly treatises,[24] the Restatement of Law,[25] and germane law review articles[26]

386, 390–91, 394–95, 94 S.Ct. 1741, 1743–44, 1745–46, 40 L.Ed.2d 215 (1974).

16. *E. g., Becker v. Interstate Properties,* 569 F.2d 1203, 1205–06 (3d Cir. 1977).

17. 1A *Moore's Federal Practice,* para. 0.307, at 3077 (2d ed. 1979).

18. *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir. 1977); *Medvecz v. Choi,* 569 F.2d 1221, 1226 n. 14 (3d Cir. 1977).

19. *Nolan v. Transocean Air Lines,* 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961).

20. 1A *Moore's Federal Practice,* para. 0.307, at 3097 (2d ed. 1979).

21. C. Wright, *Law of Federal Courts,* § 58, at 270 (3d ed. 1976) ("Mere obiter may be entitled to little weight, while a carefully considered statement by the state court, though technically dictum, must carry great weight, and may even, in the absence of any conflicting indication of the law of the state, be regarded as conclusive.") (footnotes omitted).

22. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 471, 87 S.Ct. 1776, 1785, 18 L.Ed.2d 886 (1951).

23. *Id.* (quoting *King v. Order of Travelers,* 333 U.S. 153, 160–61, 68 S.Ct. 488, 492–93, 92 L.Ed. 608 (1948)), (footnotes omitted). Unlike the dissent, I am not persuaded that the lower state court and federal court decisions relied on by the defendant, see dissenting opinion at 672, either specifically address or definitively resolve the question at issue here.

24. *Patch v. Stanley Works,* 448 F.2d 483, 488 (2d Cir. 1971).

25. *Id.; Ross v. Philip Morris & Co.,* 328 F.2d 3 (8th Cir. 1964).

26. *Southern Farm Bureau Cas. Ins. Co. v. Mitchell,* 312 F.2d 485, 497 (8th Cir. 1963); *Wendt v. Lillo,* 182 F.Supp. 56, 60 (N.D.Iowa 1960).

—particularly, it seems, of schools within the state whose law is to be predicted.[27]

■ In sum, a federal court attempting to forecast state law must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand. The rule of *Erie* calls on us to apply state law and not, as the dissent notes, "to participate in an effort to change it"[28] merely because we doubt its soundness. At the same time, however, blind adherence to state precedents "without evaluating the decision[s] in the light of other relevant data as to what the state law is, will result in injustice and a perversion of the state law which the federal court sets out to apply."[29] As this Court has declared:[30]

A diversity litigant should not be drawn to the federal forum by the prospect of a more favorable outcome than he could expect in the state courts. But neither should he be penalized for his choice of the federal court by being deprived of the flexibility that a state court could reasonably be expected to show.

### IV.

■ In support of its conclusion that Ohio's statutes of limitation bar the McKennas' actions, the district court relied, as does the dissent here, primarily on *Wyler v. Tripi,*[31] decided nine years ago by the Ohio Supreme Court. The central dispute in that case concerned the date on which a cause of action for medical malpractice accrued. Expressly following the rule announced in a series of prior decisions,[32] *Wyler* held that the cause of action came into existence at the latest, at the time the physician-patient relationship terminated, and not when the plaintiff discovered the injury.

The "termination of treatment" concept was developed very early in Ohio law[33] as an exception to the traditional rule that statutes of limitation commenced to run at the time an individual sustained injury as the result of the tortious act of another.[34]

---

27. Note, *Federal Interpretation of State Law— An Argument for Expanded Scope of Inquiry,* 53 Minn.L.Rev. 806 (1976).

28. *Tarr v. Manchester Ins. Corp.,* 544 F.2d 14, 15 (1st Cir. 1978); majority opinion at 11.

29. 1A *Moore's Federal Practice,* para. 0.309, 3112 (2d ed. 1979).

30. *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (1977).

31. 25 Ohio St.2d 164, 267 N.E.2d 419 (1971).

32. 25 Ohio St.2d at 164, 267 N.E.2d at 419, following *DeLong v. Cambell,* 157 Ohio St. 22, 104 N.E.2d 177 (1952); *Bowers v. Santee,* 99 Ohio St. 361, 124 N.E. 238 (1919); *Gillette v. Tucker,* 67 Ohio St. 106, 65 N.E. 865 (1902). The Ohio Supreme Court's consideration of the application of the "discovery rule" to statutes of limitations thus far has occurred solely in the context of actions for medical malpractice involving Ohio Rev.Code Ann. § 2305.-11 (Page 1954), rather than in the context of personal injury negligence actions under Ohio Rev.Code Ann. 2305.10 (Page 1954). The Ohio Supreme Court has noted, however, that the limitation-of-action question "obtains, in principle, irrespective of whether the case is treated as belonging under R.C. 2305.10 or under R.C. 2305.11." *Melnyk v. Cleveland Clinic,* 32 Ohio St.2d 198, 201 n. 1, 290 N.E.2d 916, 917 n. 1 (1973).

33. *See Gillette v. Tucker,* 67 Ohio St. 106, 65 N.E. 865 (1902).

34. *See, e. g. Fee's Administrator v. Fee,* 10 Ohio 469 (1891) (action for trespass on property). In the usual case—when the act constituting negligence causes direct and immediate injury—the action accrues and the period of limitations runs from the date of the act. When the negligent act is injurious only in its consequences, however, Ohio courts have held that the cause accrues and the limitations run only from the time that some consequential injury or damage manifests itself. In *Cook v. Yager,* 13 Ohio App.2d 1, 233 N.E.2d 326 (1968), for example, the syllabus stated that where the negligent act "causes no contemporaneous injury or damage to the patient but the forces set in motion by such violation proximately cause injury or damage thereafter, then, . . . the cause and the statute of limitations pertaining to the cause of action does not begin to run until the date such consequential injury or damage first manifests itself." 13 Ohio App.2d at 10–11, 233 N.E.2d at 332; *see Brush Beryllium Co. v. Meckley,* 284 F.2d 797 (6th Cir. 1960). This principle of Ohio law apparently accords with the majority rule:

As a general rule, the occurrence of an act or omission, whether it is a breach of contract

It was designed, as the *Wyler* court observed, "to avoid the harsh results of the traditional rule" [35] by tolling the applicable statute of limitations until the conclusion of the physician-patient relationship. Although this doctrine represents a "marked departure from the general rule," it "affords little relief in cases where the injury is one which requires a long developmental period before becoming dangerous and discoverable." [36] In such cases, the termination exception extends the period before the statute of limitations begins to run, "but does so by a factor which bears no logical relationship to the injury incurred." [37]

It was this kind of issue with which the Ohio Supreme Court was confronted in *Wyler.* The plaintiff there alleged that improper treatment by her physician ultimately resulted in the manifestation of asceptic necrosis, necessitating the replacement of her hip and the subsequent removal of her leg. Because the plaintiff failed to discover the alleged negligence within a year after she left the care of her physician, application of either the traditional rule or the "termination of treatment" exception would not prevent what the *Wyler* majority itself termed "the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before [s]he is even aware of its existence." [38] Troubled by this result, the Ohio court examined the laws of various jurisdictions and the growing trend away from the traditional rule and towards adoption of the discovery rule. According to this approach, the statute of limitations does not begin to run until the plaintiff actually discovers, or with due diligence should have discovered, the negligence alleged.

Although the court's examination of the cases persuaded it that "there is much to recommend the adoption of the discovery rule," [39] a bare majority nonetheless "reluctantly conclud[ed]" that "the courts of Ohio should not decree such an adoption." [40] The sole justification for refusing to adopt the discovery rule was that such action should be left to the legislature. The court was "convinced that to [adopt the discovery rule] would place [it] in the obvious and untenable position of having not only legislated, but of having done so directly in the face of a clear and opposite legislative intent." [41] Referring to the legislature's failure to adopt the discovery rule by legislation, the court concluded: "In consideration of the obvious and repeated disinclination of the General Assembly to amend its malpractice statute of limitations, we are compelled to adhere to our former decisions on the question and refrain from judicially adopting that which has so clearly been legislatively rejected." [42]

Notwithstanding this extensive pronouncement of the court's position, this same court during the following year employed the discovery rule in *Melnyk v.*

---

or of duty, whereby one sustains a direct injury, however slight, starts the statute of limitations running against the right to maintain an action. It is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case it is unimportant that the actual or substantial damage is not discovered or does not occur until later.
51 Am.Jur.2d *Limitation of Actions* § 109, at 681 (1970).
In the present case, the district court determined that consequential injury or damage resulting from Mrs. McKenna's ingestion of Ortho-Novum manifested itself, at the latest, in 1969 when Mrs. McKenna developed hypertension. Although the classification of this development, rather than the occurrence of Mrs. McKenna's transient ischemia attacks or excruciating headaches or, for that matter, the occurrence of the cerebrovascular stroke in 1972, as the first manifestation of consequential injury or damage seems somewhat arbitrary, it nonetheless appears consistent with the applicable principles of Ohio law.

35. 25 Ohio St.2d at 168, 267 N.E.2d at 421.

36. *Id.*

37. *Id.*

38. *Id.*

39. 25 Ohio St.2d at 170–71, 267 N.E.2d at 423.

40. *Id.*

41. *Id.*

42. 25 Ohio St.2d at 172, 267 N.E.2d at 424.

*Cleveland Clinic.*[43] The plaintiff there alleged that a physician employed by the Clinic had negligently left a metallic forceps and a nonabsorbent sponge in his abdomen. Even though the plaintiff failed to discover the negligence until more than one year after he left the care of the physician, the Ohio Supreme Court refused to bar his action, and held that the applicable one-year statute of limitations was tolled "until such time as the patient discovers, or by exercise of reasonable diligence should have discovered, the negligent act."[44]

Although the *Melnyk* court took great pains, as does the dissent in this case, to distinguish *Melnyk* from *Wyler* on the ground that the former did not involve the "problems faced in the defense of a 'stale' claim for medical malpractice,"[45] the distinction, as a recent commentator on Ohio law has argued, "in essence is an artificial one."[46] Indeed, *Wyler* expressly took note of the fact that courts adopting the discovery doctrine viewed it "as being entirely consistent with the policy of the statute of limitations to prevent 'stale claims.'"[47] The holding of *Wyler* declining to adopt the discovery rule depended not at all on the policy of discouraging stale claims, but solely upon the court's reluctance to contravene what it then believed to be the policy of the state legislature. By embracing the discovery rule in *Melnyk,* therefore, the Ohio Supreme Court "completely abandoned the rationale which served as the basis and justification for the *Wyler* decision, namely, that of legislative prerogative in this area."[48]

*Melnyk's* implicit rejection of the *Wyler* rationale—that only the state legislature may properly decide whether to apply the discovery rule—appears well justified. As evidence of the alleged intent of the legislature to eschew the discovery rule, *Wyler* referred to the legislature's failure to enact legislation modifying the court's prior decisions that interpreted the statute of limitations for medical malpractice.[49] Legislative inaction, however, "is a weak reed upon which to lean in determining legislative intent."[50] A statute of limitations is a product of legislation, but it is the judiciary's task to interpret and enforce such an enactment. The Ohio statute in question here is phrased in general terms and requires only that an action for bodily injury "shall be brought within two years after the cause thereof arose."[51] The legislature left unresolved when a cause of action arises and when the statute commences to run. And, in Ohio, these kinds of determinations have always been the product of "judicial interpretation, not legislative promulgation."[52] Consequently, application of the discovery rule to the facts of this case in no way intrudes on the authority of the state legislature. Indeed, Ohio's selection of the termination exception represented not only a marked departure from the traditional rule, but also a judicial determination as to when a cause of action accrues. *Melnyk's* choice of the discovery rule, at least in the absence of an expression by the legislature prohibiting such an adoption, therefore appears fully compatible with the court's responsibility to ascertain and comply with legislative intention.[53]

43. 32 Ohio St.2d 198, 290 N.E.2d 916 (1972).

44. 32 Ohio St.2d at 201, 290 N.E.2d at 918.

45. 32 Ohio St.2d at 200, 290 N.E.2d at 917.

46. 6 Akron L.Rev. 265, 273 (1973).

47. 25 Ohio St.2d at 170, 267 N.E.2d at 423.

48. 6 Akron L.Rev. 265, 272 (1973).

49. 25 Ohio St.2d at 171–72, 267 N.E.2d 419, 423–24.

50. *Berry v. Branner,* 245 Or. 307, 311, 421 P.2d 996, 998 (1966).

51. Ohio Rev.Code Ann. § 2305.10 (Page 1954). The provision pertinent to Mr. McKenna's derivative claim is similarly phrased, but states that such actions "shall be brought within four years after the cause thereof occurred . . .." Ohio Rev.Code Ann. § 2305.09 (Page 1954).

52. 6 Akron L.Rev. 265, 273 (1973).

53. A further indication that the legislature did not intend to preclude judicial adoption of the discovery doctrine was provided by the recent amendment of the medical malpractice statute. Even though that statute still allows a one year period of limitations for such actions, the judiciary's role in determining when a cause of

Moreover, the Ohio Supreme Court in *Melnyk* distinguished its decision in *Wyler* as speaking only to the question of *when* a cause of action arises, and not to the determination whether the running of the statute of limitations is, for some reason, *tolled.* [54] It then proceeded to hold that the running of the statute of limitations on Melnyk's cause of action was tolled until such time as he discovered, or by the exercise of reasonable diligence should have discovered, the negligent act, even though his cause of action accrued, under *Wyler,* at the termination of the patient-physician relationship. On this analysis, the holding in *Wyler* determines only *when* the McKennas' cause of action accrued; it is inapposite to the question whether the action was tolled until such time as the McKennas could know how Mrs. McKenna's injuries occurred.

It is claimed, nonetheless, that "*Melnyk* does not overrule *Wyler,*" but "merely carves out a very specific and narrow exception" [55] to the termination rule when, as in that case, surgical instruments are left in a patient's body. For this reason, the dissent would not apply the discovery rule to the circumstances of this case. In its view, we are improperly modifying a "decadent" and "unenlightened" doctrine of state law simply because we disagree with it. On the contrary, however, we fully recognize our responsibility to accurately apply the pertinent Ohio law. Indeed, we do not dispute

that federal courts must faithfully adhere to state substantive law in non-federal matters. But, as commentators have emphasized, such adherence should be wise and discerning. This Court has noted only recently that "while a federal diversity court must not fashion a wholly independent federal standard with which to determine matters of substantive right, it likewise must not conceive of its role as applying the state decisional law to the case at hand in a narrow and mechanical fashion." [56] Rather, a federal court must "be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts." [57]

In our view, the Ohio Supreme Court's decision in *Melnyk* not only abandoned the sole justification proffered for its opposition in *Wyler* to the adoption of the discovery rule, but also manifested a recognition that this approach alone avoids the harsh and inequitable results of applying the traditional rule in such cases. "Certainly a federal court sitting in diversity should not mechanically follow precedent and blindly apply principles of *stare decisis* when it appears that the corresponding state court would adjust its common law to meet changing conditions." [58] A fair scrutiny of the relevant Ohio precedents, with an eye toward the principles and policies underlying them, strongly indicates that the Ohio Supreme Court would extend the discovery

action arises and when the limitations period begins to run is implicitly recognized by a new provision which expressly provides that "in no event shall any medical claim against a physician . . . be brought more than four years after the act or omission constituting the alleged malpractice occurred." Ohio Rev.Code Ann. § 2305.11(B) (Page Supp.1978).

Moreover, without deciding the issue the court in *Melnyk* suggested that as a result of an amendment to the Ohio Constitution, Ohio's statutes of limitation may now have "become the sole demesne of the [Ohio Supreme] Court." 32 Ohio St.2d at 200 n. 3, 290 N.E.2d at 917 n. 3. As amended, Article IV, Section 5(B) of the Ohio Constitution now provides in part: "The supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge or modify any substantive rights."

54. Under the longstanding Ohio "syllabus rule," only that which is stated in a syllabus or in an per curiam opinion represents an accurate and authoritative statement of law by the Ohio Supreme Court. *E. g., In State ex rel. Canada v. Phillips,* 168 Ohio St. 191, 200, 151 N.E.2d 722, 724 (1958).

55. Dissenting opinion typescript at 670.

56. *Medvecz v. Choi,* 569 F.2d 1221, 1226 (1977).

57. *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (1977).

58. *Id.* at 1215–16 (Hunter, J., dissenting).

rule set forth in *Melnyk* to include the type of personal injury action present here.

The task of a federal court sitting in diversity is often difficult, for it must forsake its own expertise and assume that of the foreign state. Required as we are to predict how the Ohio Supreme Court would decide the present case, however, we believe that the Court would hold that the applicable statutes of limitation in this case were tolled until the McKennas knew, or by the exercise of reasonable diligence should have discovered, the cause of Mrs. McKenna's injuries. Accordingly, we reverse the judgment of the district court, and remand for further proceedings consistent with this opinion.

## SUPPLEMENTAL OPINION SUR THE DENIAL OF THE PETITION FOR REHEARING

ADAMS, Circuit Judge.

Shortly after the opinions in this matter were filed, Counsel for Ortho Pharmaceutical Corporation brought to the attention of the Court the fact that the Governor of Ohio on March 13, 1980, signed into law a bill amending § 2305.10 of the Ohio Rev. Code. While that section still states, as before, that "[a]n action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose," the amendment now provides further that:

> For purposes of this section, a cause of action for bodily injury caused by exposure to asbestos or to chromium in any of its chemical forms arises upon the date on which the plaintiff is informed by competent medical authority that he has been injured by such exposure, or upon the date on which, by the exercise of reasonable diligence, he should have become aware that he had been injured by the exposure, whichever date occurs first.

Relying primarily on this amendment, Ortho submitted a petition for rehearing claiming that this provision removes the basis for our decision that "the Ohio Supreme Court would extend the discovery rule set forth in *Melnyk v. Cleveland Clinic*,

32 Ohio St.2d 198, 290 N.E.2d 916 (1972) to include the type of personal injury action present here." (Majority opinion typescript at 666–667). The panel requested the McKennas to file an answer to Ortho's petition. After reviewing the parties' briefs in light of the amendment to § 2305.10, we adhere to our original position.

Prior to the amendment in question, § 2305.10 required that an action for bodily injury "shall be brought within two years after the cause thereof arose." Regarding the question *when* a cause of action arises, however the statute was silent. In amending this provision, the legislature specifically stipulated that a cause of action for bodily injury caused by exposure to asbestos or to chromium arises upon the date on which the plaintiff is informed or reasonably should have become aware that he was injured by the exposure.

■ Ortho argues that this amendment represents a clear legislative pronouncement that the "Ohio courts are to apply a discovery rule in the two enumerated categories of cases and none other." Invoking the precept of *expressio unius est exclusio alterius*, Ortho relies on 50 Ohio Jurisprudence 2d § 188 to support its contention that in Ohio the specific enumeration by the legislature of items in a statute implies the exclusion of others. Ortho then concludes, in effect, that the legislature, in specifically postponing the time when a cause of action arises in cases involving injury resulting from asbestos or chromium, thereby precluded application of the discovery rule in all other cases.

As the section immediately following that relied on by Ortho points out, however, "[t]he maxim 'expressio unius est exclusio alterius' is not of universal application and caution should be exercised in its use," *id.* § 189 at 166–67. In our view, the cautious and more reasonable construction of the amendment, a well as the one we believe the Ohio Supreme Court would embrace, is that it was not meant to preclude judicial adoption of the discovery rule in appropriate circumstances. Adoption of the con-

trary construction would effectively abrogate that court's well-established principle, expressly reaffirmed in *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971), that a cause of action for medical malpractice arises, at the latest, when the physician-patient relationship terminates. We believe the Ohio Supreme Court would hold that if the legislature had intended, by its passage of this amendment, not merely to extend greater protection to victims of asbestos and chromium poisoning but at the same time to deprive victims of medical malpractice of the protection they currently enjoy under the Ohio Supreme Court's decisional law, it would have done so expressly and not by implication.

Even if the amendment to § 2305.10 does—by indicating specifically when a cause of action arises in cases of asbestos or chromium poisoning—effectively establish just when a cause of action must arise in all other cases, however, that would not affect our decision here. For we accepted the district court's determination that the McKennas' causes of action arose at the time consequential injury resulted from Mrs. McKenna's ingestion of Ortho-Novum. Nevertheless, we held that the Ohio Supreme Court would decide that the applicable statutes of limitation were tolled until the McKenna's knew, or by the exercise of reasonable diligence should have discovered, the cause of Mrs. McKenna's injuries. In so doing, we expressly followed the distinction drawn by the Ohio Supreme Court in *Melnyk* between the question *when* a cause of action arises and the determination *whether* the statute of limitations may, for some reason, be tolled on such action. Since the amendment at issue, even if it implicates the question when a cause of action for bodily injury from birth control pills arises, does not affect the determination whether the statute of limitations respecting that action may be tolled, we adhere to our prior opinion.

Judge Hunter joins in this opinion.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

With all due respect to my colleagues, I believe that they err in their continuing adherence to their view on the roles of Ohio's legislative and judicial branches in the alteration of Ohio's statute of limitations. As I indicated earlier, it is my belief that the Ohio courts have in the past and will in the future adhere to the view that "statutes of limitation are a legislative prerogative and their operation and effect are based upon important legislative policy." *Wetzel v. Weyant*, 41 Ohio St.2d 135, 323 N.E.2d 711, 713 (1975).

As is noted by the majority, the Ortho Pharmaceutical Corporation brought to the attention of this court legislation which amends Ohio's statute of limitations, § 2305.10 Ohio Rev.Code, to include a discovery period for two types of injury, those caused "by exposure to asbestos or to chromium." This legislation is irreconcilable with the panel's rationale. It clearly evidences an intention of the Ohio legislature to reject a general discovery rule that would encompass the plaintiffs' suit and to continue their traditional role in the area of statutes of limitation.

I agree with the majority that the Ohio Supreme Court would not blindly follow the rule of *expressio unius est exclusio alterius*; however, I believe that it would be followed here. First, *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971), where Ohio's Supreme Court rejected a general discovery rule, is an implicit application of *expressio unius est exclusio alterius*. The following passage indicates that the Ohio Supreme Court would apply the rule, adverse to the plaintiffs, when it reflected upon the new amendment to § 2305.10 of the Ohio Rev. Code.

It should also be noted that although the General Assembly has refused to adopt the discovery rule for medical malpractice cases, it has nevertheless created certain exceptions to the general operation of various other statutes of limitation.

*Wyler,* 267 N.E.2d at 423. Second, I believe that Ohio's Supreme Court would consider the members of the Ohio General Assembly to be perfectly capable of drafting a general discovery statute and the court would hold that the General Assembly would have done so had it felt that a more general discovery rule was desirable. I note that the General Assembly has had general statutes presented to it in the past and has chosen not to adopt them. *See Wyler v. Tripi,* 267 N.E.2d at 423 (describing House Bill No. 177, introduced in the 101st General Assembly, which would have provided for a discovery period in all malpractice cases).

The majority's argument that legislative prerogative extends only to the issue of "when" a statute starts to run and not to whether it is "tolled" is simply a semantic one. The key issue here is which branch of government decides whether these plaintiffs' suit is timely. Unlike the relationship between many state appellate courts and their respective legislatures, the Ohio courts have more frequently deferred to the Ohio General Assembly in cases of this type. On this record I believe they would also defer to the Ohio legislature and so should the United States Court of Appeals for the Third Circuit.[1]

Thus, I would grant the petition for rehearing and affirm the decision of the lower court.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

A.

Although I am as moved as my colleagues are by the alleged tragic effects from Mrs. McKenna's ingestion of appellee's birth control pills and while I am as convinced as they are that the discovery rule is a humane and desirable component of medical malpractice law,[1] I must respectfully dissent. I cannot join them because the Ohio Supreme Court has not adopted and would not now adopt the modern view on discovery in medical malpractice cases. I see no sign that Ohio is withdrawing from its views on the medical malpractice doctrines relevant to this case. The distinguished trial judge who tried this case so patiently, was not unsympathetic to the plight of Mrs. McKenna; yet from my view he is being reversed—not because he was wrong—but because the relevant Ohio law is unenlightened.

With respect, I submit that the majority disregards Ohio's current (though archaic) doctrine and announces a rule of law that Ohio should adopt. In 1971 the Ohio Supreme Court firmly and resolutely rejected the discovery rule. *Wyler v. Tripi,* 25 Ohio St.2d 164, 267 N.E.2d 419 (1971). Because I conclude that the Ohio Supreme Court would adhere to the *Wyler v. Tripi* decision, I must dissent.

B.

Ohio courts have long held that the plaintiff's inability to discover the tortious act of the defendant has no relevance to the running of the applicable statute of limitations. *E. g., Kerns v. Schoonmaker,* 4 Ohio 331 (1831) (negligent acts of justice of the peace); 34 Ohio Jurisprudence 2d 536. This doctrine was reaffirmed by the Ohio Supreme Court in *Wyler v. Tripi* in 1971 and applied to medical malpractice actions. In *Wyler v. Tripi,* the court rejected an explicit request of the plaintiff to overrule that harsh precedent. In declining the invitation, the court recognized that its action could "lead to the unconscionable result that [an] injured party's right to recovery [would] be barred by the statute of limitations before he is even aware of its existence." 267 N.E.2d at 421. The court relied neither on a policy justification for a short

---

1. In addition to the new amendment Ortho Pharmaceutical Corp. has forwarded to this court a decision by the Court of Appeals of Ohio, Eighth District, *Saultz v. Funk,* No. 38328 (May 24, 1979), in which the court refused to extend the discovery rule. This too has failed to persuade the majority. *Saultz* is merely one of an unbroken line of cases from Ohio which

rejects the discovery rule announced by the majority.

1. In *Gemignani v. Philadelphia Phillies National League Baseball Club, Inc.,* 287 F.Supp. 465 (E.D.Pa.1967), I held that the Pennsylvania discovery rule tolled the statute of limitations until the plaintiff learns of the casual relationship between his physician's actions and his injury.

period of limitations nor on humanity considerations when it rejected the discovery rule. Indeed, it noted that "[t]here is much to recommend the adoption of a discovery rule." It declined to adopt the rule on the ground that

> to do so would place us in the obvious and untenable position of having done so directly in the face of a clear and opposite legislative intent.[2]

*Id.* at 423.

In spite of this explicit statement the majority declines to follow *Wyler.* It argues that the *Wyler* rationale would be abandoned in a 1980 decision of the Ohio Supreme Court and thus it feels free to include the discovery rule in its decision. I do not agree. None of the materials the majority cites persuades me that an abandonment of the *Wyler* rationale is in the wind, nor have I unearthed any materials that foretell such an event.

The primary source of the majority's view is *Melnyk v. The Cleveland Clinic*, 32 Ohio St.2d 198, 290 N.E.2d 916 (1972), a decision of the Ohio Supreme Court, decided one year after *Wyler.* In an opinion by Justice Herbert, who also wrote the *Wyler* opinion, the court stated:

> . . . . the negligent leaving of a metallic forceps and a nonabsorbent sponge inside a patient's body during surgery will toll the running of the statute of limitation upon that cause of action until such time as the patient discovers, or by the exercise of reasonable diligence should have discovered, the negligent act.

290 N.E.2d at 918.

*Melnyk* does not overrule *Wyler*; it merely carves out a very specific and narrow exception: when surgical instruments are left in a patient's body a discovery period tolls the running of the statute of limitations. The *Melnyk* court did not "abando[n] the rationale" of *Wyler* when it created this exception. Majority Opinion Typescript, at 666. The court held that the case before it did not disturb the legislative judgment. Justice Herbert noted that the limitations period in most malpractice cases reflected a balancing of the interests of physicians and patients and that the Ohio legislature had struck the balance in favor of physicians because of

---

**2.** The *Wyler* court stated:

The General Assembly has often considered and left standing our interpretation of R.C. 2305.11, as announced in *Gillette, Bowers* and *DeLong.* In the 106th General Assembly (1965–66), House Bill No. 30 was introduced. In the 105th General Assembly (1963–64), House Bill No. 959 was introduced. Both bills would have amended R.C. 2305.11, by increasing the limitation period for malpractice to two years. Neither bill survived the scrutiny of the committee to which it was referred. A similar fate befell House Bill No. 907, which was introduced in the 103rd General Assembly (1959–60); and was designed to eliminate the statute of limitations for malpractice.

The most significant expression of legislative position occurred in the 101st General Assembly (1955–56), less than three years after this court's decision in the *DeLong* case. In that session, House Bill No. 177 was introduced to add the following language to R.C. 2305.11:

"If the action is for malpractice the cause thereof shall not accrue until the malpractice is discovered."

House Bill No. 177 was rejected by the committee to which it was referred.

It should also be noted that although the General Assembly has refused to adopt the discovery rule for medical malpractice cases, it has nevertheless created certain exceptions to the general operation of various other statutes of limitation. (Cf. *Mosby v. Michael Reese Hospital* [1964], 49 Ill.App.2d 336, 199 N.E.2d 633.) In R.C. 2305.15 and 2305.16, the General Assembly has provided that the statute of limitations is tolled if the person entitled to bring the action is under a legal disability, or if the person liable to an action departs or absconds from the state. Moreover, in R.C. 2305.09 the General Assembly specifically enacted a discovery rule "if the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property." Finally, under R.C. 2305.04, if a person is entitled to recover the title or possession of real property, but is under legal disability, the statute of limitations is tolled. Significantly and intentionally absent is any statutory provision to the effect that the lack of knowledge on the part of an injured party in a medical malpractice action operates to delay the commencement of the running of the statute of limitations. See *Townsend v. Eichelberger* (1894), 51 Ohio St. 213, 38 N.E. 207.

267 N.E.2d at 423.

the difficulties of proof in most malpractice cases. The court argued that in a "foreign-objects" case the plaintiff's proof of the physician's negligence, once the existence of the foreign object was established, was irrefutable, and therefore the court felt free to include a discovery period in the "foreign objects" cases. 290 N.E.2d at 917. The *Melnyk* court carefully noted that it did not "need to disturb the holding in *Wyler*, nor interfere in the affairs of our sister branch government, in order to accord this rule of law the viability we have determined it must have." *Id.* at 918.

The following language from the beginning of the *Melnyk* opinion further suggests the court was reaffirming the legislature's authority in this area.

The *Wyler* case involved the problems faced in the defense of a "stale" claim for medical malpractice. As in other fields of highly technical and inexact science, evidence in defense of such claims is unusually difficult to acquire and present. . . . [T]he General Assembly exercised its prerogative in this field and enacted a statute of limitation of comparatively brief duration. *Wyler* recognized the legislative authority to so act, but as heretofore noted, did so with an unmistakable lack of enthusiasm.

*Id.* at 917 (footnotes omitted).

The validity of the *Wyler* rationale is underscored by a decision of the Ohio Supreme Court five years later, *Amer v. Akron City Hospital*, 47 Ohio St.2d 85, 351 N.E.2d 479 (1976). There the court deferred to the legislative judgment on statutes of limitations. In *Amer* a husband brought an action for loss of consortium because of an alleged medical malpractice upon his wife. The court held that the applicable statute of limitations "is not *tolled* until termination of the physician-patient relationship." 351 N.E.2d at 480. (quotation is from the court's syllabus) (emphasis added).[3] The husband had argued that tolling was necessary because the mal-

practice was not discovered until after the termination of the physician-patient relationship. If tolling was not permitted, his action would be barred before his wife's was barred, even though his action arose out of the same negligence. The court held that it would not disturb its forty-year-old rule set forth in *Kraut v. Cleveland Ry. Co.*, 132 Ohio St. 125, 5 N.E.2d 324 (1936) because the legislature had failed to change the rule, although it had recently amended portions of the code covering statutes of limitations in medical malpractice cases.

The *Amer* decision was rendered over the dissent of Justice Herbert, the author of the *Wyler* and *Melnyk* opinions. Justice Celebrezze also dissented and argued that the statute of limitations should not run until the physician-patient relationship terminated. He stated:

"Justice in this case cries out for a remedy. How can anyone be precluded from asserting a claim by a statute of limitations which expires before the discovery of the injury? How can anyone charged with the responsibility of administering justice allow such an absurdity?"

351 N.E.2d at 485.

In spite of this plea, he was unable to persuade a majority of the court to reject the legislative decision.

The *Amer* decision convinces me that the Ohio Supreme Court has not abandoned its decision not to "interfere in the affairs of [its] sister branch [of] government." *Melnyk*, 290 N.E.2d at 918. Further it shows that whether or not the Oregon courts feel that legislative inaction "is a weak reed upon which to lean," *Berry v. Braner*, 245 Or. 307, 421 P.2d 996, 998 (1966), *quoted in* Majority Opinion Typescript, at 665, the Ohio Supreme Court has chosen to lean on it.

### C.

Finally, I am convinced that the majority reading of the *Melnyk* decision is incorrect

---

**3.** *See* Majority Opinion, Typescript at 666 n. 54, for a discussion of the importance of the court's syllabus.

because every state or federal court decision in Ohio on this question has rejected that reading, *e. g., Simmons v. Riverside Methodist Hospital,* 44 Ohio App.2d 146, 336 N.E.2d 460 (1975); *Woodgeard v. Miami Valley Hospital Society of Dayton,* 47 Ohio Misc. 43, 354 N.E.2d 720 (C.P.1975), *aff'd mem.* No. C.A. 4772 (Ct.App. Sept. 12, 1975); *Shrewsbury v. Smith,* 511 F.2d 1058 (6th Cir. 1975), including those courts that have considered claims for injuries allegedly resulting from birth control pills. *E. g., Gillan v. Searle Laboratories,* Civ. No. C–2–77–863 (S.D.Ohio, Oct. 13, 1978).

### D.

The instant case reflects the inherent disadvantage of a plaintiff making the tactical decision to litigate a diversity case in a federal court[4] where the core of plaintiff's case is contingent upon a federal court anticipating a state law doctrine in the "womb of time, but whose birth is distant."[5] For we have been asked here to deliver prematurely a new Ohio statute of limitations doctrine despite the fact that that concept has been expressly rejected, and recently so, by every state and federal court in Ohio.[6] I do not claim that the Ohio Supreme Court's views on when the statute of limitations starts to run in cases such as these are part of the modern or enlightened trends. But

if counsel wants to test whether Ohio will have more enlightened views on the statute of limitations issues, it is far better for counsel to litigate those issues in the state courts of Ohio which have the final say on when their recently expressed views will be repudiated.

For the reasons expressed above I respectfully dissent.

---

**4.** I recognize that plaintiff originally filed suit in a Pennsylvania state court, but obviously counsel must have been aware that suits such as the instant one can be removed to a federal district court pursuant to 28 U.S.C. § 1441. This court, through Judge Aldisert, described *Huddell v. Levin,* 537 F.2d 726, 732–33 (3d Cir. 1976) (footnote omitted) as a "troublesome case, implicating nascent concepts of state tort liability, [and] demonstrat[ing] again the impracticality of the federal diversity forum in the twentieth century." This court further emphasized:

We are to apply New Jersey law, yet we are without the specific guidance of viable New Jersey precedents. This appeal requires us to predict how the New Jersey Supreme Court would react when presented with novel and difficult questions of tort law. Specifically we are to predict how that court would view the liability of an automobile manufacturer for the design of a head restraint in a case in which it is alleged that fatal injuries were caused by impact against the head re-

straint received when the decedent's stopped car was struck from behind by another car travelling at least 50 m. p. h.

Here, unlike *Huddell,* there is recent viable Ohio precedent. But we have been asked to predict that such recent precedent will be overruled.

**5.** In a somewhat related context Judge Learned Hand stated:

Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it.

*Spector Motor Service, Inc. v. Walsh,* 139 F.2d 809, 823 (2d Cir.) (Learned Hand, J. dissenting), *vacated and remanded,* 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

